IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

MUSA SHABAZZ,
     Petitioner,

vs.                         Case No.: 4:15cv137/RH/EMT

SECRETARY DEPARTMENT OF
CORRECTIONS,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

     This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF Nos. 30, 32).  Petitioner filed a reply (ECF No. 33).

     The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 32).[1]  Petitioner was charged in the Circuit Court in and for Leon County, Florida, Case No. 2002-CF-2264, with two counts of attempted first degree murder of Officer Chuck Perry (Counts I and II), and one count of fleeing or attempting to elude an officer (Count IV) (Ex. A at 1–2).[2]  Following a jury trial, Petitioner and his father were found guilty as charged (Ex. A at 58–60, Exs. B, C).  On November 1, 2004, Petitioner was sentenced to concurrent terms of twenty (20) years in prison on Counts I and II, and a consecutive split sentence of five (5) years in prison followed by five (5) years of probation on Count IV (Ex. A at 89–99).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D04-5119 (Ex. D).  On June 14, 2006, the First DCA affirmed the judgment per curiam, but remanded for correction of a scrivener's error in the written judgment (the judgment erroneously listed Petitioner's

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted by Respondent (ECF No. 32).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

[2] Petitioner's father, Abdul Shabazz, was charged in the same information with two counts of attempted first degree murder of Officer Chuck Perry (Counts I and II), one count of attempted first degree murder of Office Michael Goldwich (Count III), and two counts of shooting at an occupied vehicle (Counts V and VI) (Ex. A at 1–3).

conviction of attempted first degree murder as a life felony, instead of a first degree felony) (Ex. G).  Shabazz v. State, 931 So. 2d 224 (Fla. 1st DCA 2006).  The mandate issued June 30, 2006 (Ex. H).  The circuit court rendered a corrected judgment on June 19, 2006 (Ex. I).

On July 12, 2006, Petitioner filed a motion for reduction or modification of sentence, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (Ex. J).  The state circuit court summarily denied the motion on July 20, 2006 (Ex. K).

On October 19, 2006, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D06-5538, alleging ineffective assistance of appellate counsel (Ex. L).  The First DCA granted the petition in an opinion rendered on March 26, 2007, and directed the clerk of the circuit court to treat the opinion as a notice of appeal upon issuance of the court's mandate (Ex. O).  Shabazz v. State, 955 So. 2d 57 (Fla. 1st DCA 2007).  The First DCA's mandate issued May 24, 2007 (Ex. R). Petitioner filed a motion requesting that the First DCA certify a question of great importance to the Supreme Court of Florida (Ex. T), but the First DCA denied the motion (see Ex. U).

Petitioner's appellate counsel filed an initial brief in the second direct appeal, Case No. 1D07-4530 (Ex. X).  On March 5, 2010, the First DCA affirmed the judgment of conviction per curiam without written opinion (Ex. AA).  Shabazz v.

State, 29 So. 3d 1123 (Fla. 1st DCA 2010).  The mandate issued March 31, 2010 (Ex. BB).

On March 22, 2010, Petitioner filed a motion to correct illegal sentence, pursuant to Rule 3.800 of the Florida Rules of Criminal Procedure (Ex. CC).  The state circuit court summarily denied the motion on July 23, 2010 (Ex. DD).

On October 4, 2010, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, asserting six claims (Ex. EE at 1–17).  He subsequently amended the motion to add two claims (*id.* at 18–33).  The court summarily denied five claims and set an evidentiary hearing on the remaining three claims (*id.* at 41–45).  The court appointed counsel to represent Petitioner at the evidentiary hearing (*id.* at 46).  Following the hearing, the court denied Petitioner's remaining claims (Ex. EE at 49, Ex. GG).  Petitioner, through counsel, appealed the decision to the First DCA, Case No. 1D13-2046 (Ex. HH).  The First DCA affirmed the decision per curiam without written opinion on October 3, 2014, with the mandate issuing October 29, 2014 (Exs. JJ, KK).  Shabazz v. State, 150 So. 3d 1140 (Fla. 1st DCA 2014) (Table).

Petitioner filed the instant federal habeas action on March 2, 2015 (ECF No. 1).

## II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the

judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3]  The appropriate test was described by Justice O'Connor as follows:

---

[3] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  "Clearly established Federal law, includes only the holdings, as opposed to the dicta, of the Supreme Court's decisions."  Woods v. Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (citation omitted).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim. However, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. See Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'"  Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).  The AEDPA's "unreasonable application" standard focuses on the state

court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, *supra* at 1291

(citing Richter).  Under § 2254(d), a habeas court must determine what arguments or

theories supported or could have supported the state court's decision, and then ask

whether it is possible that fairminded jurists could disagree that those arguments or

theories are inconsistent with the holding in a prior decision of the Supreme Court.

*See* Richter, 562 U.S. at 102; *see also* Gill, *supra,* at 1292 (the federal district court

may rely on grounds other than those articulated by the state court in determining that

habeas relief was not warranted, so long as the district court did not err in concluding

that the state court's rejection of the petitioner's claims was neither an unreasonable

application of a Supreme Court holding nor an unreasonable determination of the

facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the

merits in State court where that adjudication "resulted in a decision that was based on

an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified

that: "a decision adjudicated on the merits in a state court and based on a factual

determination will not be overturned on factual grounds unless objectively

unreasonable in light of the evidence presented in the state-court proceeding."

Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003)

(dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C. § 2254(e)(1); *see, e.g.,* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").   The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See* Gill, 633 F.3d at 1292.  A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision.  *Id.*

Only if the federal habeas court finds that the petitioner satisfied § 2254(d) does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842,

168 L. Ed. 2d 662 (2007); <u>Jones</u>, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

## III.    EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, *see* 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  <u>Duncan</u>, 513 U.S. at 365–66; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); <u>Picard</u>, 404 U.S. at 277–78.

The Supreme Court has provided lower courts with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In <u>Picard v. Connor</u>, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must

first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982). In Anderson, the habeas petitioner was granted relief by the Sixth Circuit Court of Appeals on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. 459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." Anderson, 459 U.S. at 7. The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. *Id.*, 459 U.S. at 7 and n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the

federal claim asserted in the cited case was not the same as the federal claim on which

federal habeas relief was sought.  *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement

in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the

exhaustion requirement so as to mandate that, if state and federal constitutional law

overlap in their applicability to a petitioner's claim, the petitioner must raise his issue

in terms of the applicable federal right in state court in order to obtain federal review

of the issue.[4]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim

that an evidentiary ruling at a state court trial denied him the due process of law

guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in

state court." Duncan, 513 U.S. at 365–66.  More recently, the Supreme Court again

focused upon the requirement of "fair presentation," holding that "ordinarily a state

prisoner does not 'fairly present' a claim to a state court if that court must read beyond

a petition or a brief (or a similar document) that does not alert it to the presence of a

federal claim in order to find material, such as a lower court opinion in the case, that

does so." Baldwin v. Reese, 541 U.S. 27, 32, 124 S. Ct. 1347, 158 L. Ed. 2d 64

(2004).  In Baldwin, the Supreme Court recognized that "[a] litigant wishing to raise

a federal issue can easily indicate the federal law basis for his claim in a state-court

---

[4] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.  513 U.S. at 366.

petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.* This language, while not part of the Court's holding, provides helpful instruction. With regard to this language, the Eleventh Circuit explained in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[5]

The Eleventh Circuit, prior to Duncan, had broadly interpreted the "fair presentation" requirement. After Duncan, however, the Eleventh Circuit has taken a more narrow approach. For example, in Zeigler v. Crosby, the court held that the

---

[5] In his initial brief before the Court of Criminal Appeals, McNair cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the United States Constitution.  345 F.3d 1300, 1307 (11th Cir. 2003).  The Eleventh Circuit specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words: "Appellant was denied due process and a fair trial. . . .," which could be interpreted as asserting a fair trial claim under the Due Process Clause of the Florida Constitution. *Id.* at 1308 n.5.  The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases.  The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us." *Id.*

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review. *See* O'Sullivan, 526 U.S. at 839–40, 848; Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See* Coleman v. Thompson, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 115 L. Ed. 2d

640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 151 L. Ed. 2d 820 (2002).  The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," Siebert v. Allen, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," Judd v. Haley, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner.  Ford v. Georgia, 498 U.S. 411, 424–25, 111 S. Ct. 850, 112 L. Ed. 2d 935 (1991); Upshaw v. Singletary, 70 F.3d 576, 579 (11th Cir. 1995).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[6]  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

To overcome a procedural default such that the federal habeas court may consider the merits of a claim, the petitioner must show cause for the default and prejudice resulting therefrom or a fundamental miscarriage of justice.  Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).  To satisfy the

---

[6] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994).

miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." Schlup, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.* Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence. *See* McQuiggin v. Perkins, — U.S. —, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013). As the Court stated in Schlup, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]." 513 U.S. at 332; *see also* House, 547 U.S. at 537.

Within this framework, the court will review Petitioner's claims.

## IV.   PETITIONER'S CLAIMS

A.    <u>Ground One:  "Counsel failed to object or seek a new trial on the basis</u>
<u>that a large number of uniformed officers came to the last day of trial raised</u>
<u>[sic] to the level of inherent prejudice depriving the defendant of a fair trial."</u>

Petitioner contends trial counsel was ineffective for failing to object to the large

number of uniformed police officers present in the courtroom during the last day of

trial (ECF No. 1 at 5).[7]  Petitioner alleges that counsel's failure to object caused an

inherent injustice, because the victims of the crimes were police officers, and the sole

reason for the presence of the other officers on the last day of trial was to send a

message to the jury that a guilty verdict was warranted (*id.*).  Petitioner alleges that

trial counsel admitted during the post-conviction evidentiary hearing that he had no

strategic reason for his failure to object (*id.*).

Respondent concedes that Petitioner exhausted this claim in the state courts

(ECF No. 30 at 20–21).  Respondent contends the state court's adjudication of the

claim is entitled to deference under the AEDPA (*id.* at 21–48).

1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set

forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  To obtain relief under

<u>Strickland</u>, Petitioner must show (1) deficient performance by counsel and (2) a

reasonable probability that, but for counsel's deficient performance, the result of the

---

[7] The page references to the parties' pleadings used in this Report reflect the page numbers
as enumerated in the court's electronic docketing system rather than those the parties may have
assigned.

proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a

showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that

counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436

F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305,

1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong

is "reasonableness under prevailing professional norms."  Strickland, 466 U.S. at

688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and

courts should make every effort to "eliminate the distorting effects of hindsight, to

reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

conduct from counsel's perspective at the time."  *Id.* at 689.  Furthermore, "[e]ven if

many reasonable lawyers would not have done as defense counsel did at trial, no relief

can be granted on ineffectiveness grounds unless it is shown that no reasonable

lawyer, in the circumstances, would have done so."  Rogers v. Zant, 13 F.3d 384, 386

(11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide

range of professional competence."  Jones, 436 F.3d at 1293 (citing Strickland, 466

U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing

that petitioner was "not entitled to error-free representation").  "[T]here are no

'absolute rules' dictating what reasonable performance is . . . ."  Michael v. Crosby,

430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).  Indeed,

"'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. *See* Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting Strickland, 466 U.S. at 693); *see also* Williamson v. Fla. Dep't of Corr., 805 F.3d 1009, 1016 (11th Cir. 2015) (a petitioner must show that the likelihood of a different result is substantial, not just conceivable) (citing Richter, 562 U.S. at 112). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. Strickland, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted

according to law.  Strickland, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.  Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal.  See Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting Strickland's high bar is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010).  "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult."  Richter, 131 S. Ct. at 788.  As the Richter Court explained:

> The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question

> is whether there is any reasonable argument that counsel satisfied
> Strickland's deferential standard.

*Id.* (citations omitted).  Petitioner must show "that every fair-minded jurist would

conclude 'that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different.'"  Jones v. GDCP

Warden, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting Strickland, 466 U.S. at 694).

### 2. Federal Review of State Court Decision

Petitioner raised this claim as Ground Five in his Rule 3.850 motion (Ex. EE

at 9–10).  This claim was one of the claims litigated at the limited evidentiary hearing.

At the evidentiary hearing, Petitioner testified that on the day the jury finished

deliberating and returned its verdict, there were 20–30 uniformed officers in the

courtroom (Ex. GG at 9).  Petitioner testified that he asked his trial counsel why there

were so many officers in the courtroom, and counsel responded that they were there

to show solidarity for their fellow officers (*id.* at 10).  Petitioner testified that the jury

came into the courtroom with the uniformed officers present, and then the judge

directed the jury to resume deliberations (*id.*).  Petitioner testified that the jury

resumed deliberations (*id.*).  He testified that the officers were also present when the

jury reentered the courtroom to re-watch a videotape that had been admitted into

evidence during the State's case-in-chief (*id.* at 13–14).

Petitioner's trial counsel, Leonard Holton, testified at the evidentiary hearing that he had been practicing law since 1975 (Petitioner's trial was in 2004) (Ex. GG at 50).  He testified that he practiced criminal defense from 1975–1984 (*id.*).  Attorney Holton testified that he served as Director of the Sentencing Guidelines Commission from 1984–1994 (*id.* at 50–51).  He testified that he had been practicing  with the public defender's office from 1994 to the present (*id.* at 51).

Attorney Holton testified that he recalled that a number of uniformed law enforcement officers were in the audience on September 30, 2004, the day the jury returned a verdict (Ex. GG at 44).  He testified that Petitioner "expressed a concern" about it (*id.* at 46).  When asked whether he believed that police officers in the audience might persuade a jury in some way, Attorney Holton responded:

> I think the possibility exists.  I mean uniformed officers I think, in America—uniformed officers carry with them as a result of the uniform, just based on the uniform it's connected with certain concepts of law and order and protection.  So, it's an authority figure.

(Ex. GG at 46).

When asked whether he had a reason for not commenting to the court on the police presence, Attorney Holton responded:

> Well, there's not a reason per say [sic].  It wouldn't be the first time that law enforcement officers who were witnesses in cases came back in. Now, obviously the number that were there, they were not all witnesses. I don't know that I had a—if you're saying was there a strategic reason? No, there was no strategic reason why I did not object.

(Ex. GG at 49).

Upon questioning by the attorney for the State, Attorney Holton testified, "I'm sure it crossed my mind whether I should object or not, . . . .  I don't have any independent recollection of what my thought process was.  It's clear form the record I did not object." (*id.* at 52).  The questioning continued:

> Q [by counsel for the State].  But I guess the point, the fact that you didn't object to it—do you believe you would have objected to it, if you thought that it was going to unfair—you believed it may unfairly prejudice the defendant, in the fact that the jury would feel undue influence to reach a verdict favoring the State in the case, as opposed to the defense by the presence of the officers?
> . . . .
> A.  Well, if I understand your question, if I thought it would have affected the fairness of the trial that my client was receiving, I would have objected.
>
> These sort of things are a balancing issue.  And again, I would have to know because it would seem important to me to know whether or not they [the uniformed officers] came in after the jury was seated, or if they were there before the jury was seated.
>
> Q.  Well, I guess two things:  one, if it would have been important for you to know, you would have been present at that time.  Is that correct?
>
> A.  I guess.
>
> Q.  So you would have seen at the time whether or not they would have been in there before the jury came in, or after the jury came in?
>
> A.  Absolutely.
>
> Q.  All right.  So based upon the fact that you were there at the time would you have reached a conclusion?  Would you have said this

is being unfair, I need to raise the objection or say I don't think it's going to be an impact; I don't think it's sufficient impact that I'm going to make an objection?

A.  Let's put it this way.  If the jury were already in the box when the officers came in, I would probably not want to draw anymore [sic] attention to it by objecting.  If they were here before the jury was seated, I would think that that would have been something that I would have—I would have raised with the Court.

Now the third possibility is that at this point in time, I'm in my file and I'm a little tied up; my attention is elsewhere.  But again, as the motion raises—and I don't know if that's exactly in the record.  I kind of doubt it's in the record, per say [sic].  There was apparently a conversation where Mr. Shabazz brought it to my attention.  So I became aware of it, I just don't know at what point in time.

Q.  Okay.  And, I'm guessing.  You said you would have been in your file.  This would have been after closing argument, after instructions had been given.

And, as I think you noticed in the verdict or in the transcript that you were shown, the jury was in the courtroom approximately two minutes from I think 8:55 to 8:57, whenever they were called back in asking if they heard anything [i.e., exposed to any outside information about the case (*see* Ex. B at 480)].  So it would have been a very short duration that the jury would have been exposed to the officers.  Is that correct?

A.  Again, relying upon the record, that would have been a short period of time.

Q.  But during that time period, what would have been so necessary for your nose to have been in the file?

A.  Well, anytime you come back from a recess or come back from something prior, almost all the time client [sic] will have an issue or I will speak with client [sic]; is there anything that went on yesterday that we need to talk about?  Do you have any questions?  And it could have

been something that I was directed to my file.  Again, I'm saying that's a possibility.  I don't know that that's what happened because I don't recall.

Q.  And the testimony was and is consistent with the motion, the fact that the defendant brought it to your attention at the time, so it would have been on your radar screen?

A.  If, in fact, he brought it to my attention and I seem to recall that he did.  Yeah, it's on my radar screen, I was aware of it.

Q.  So at some stage, you had to make the decision whether to object or not to object.  Is that correct?

A.  Yes.
. . . .

Q.  And you decided not to object.

A.  Apparently, I did.  Yes, sir.  I don't recall why I made the decision.

Q.  Well, but I guess if we go back to the point of you don't know why you made the decision.  But if you would have felt that it was some way unduly prejudicial to your client, would you have raised an objection?

A.  Again, that's a weighing process.  Do I believe that having more officers of disproportionate representation, uniformed officers sitting nicely together in a block would that be something that the jury notices?  Absolutely.  What affect [sic] will it have on the jury?  That's kind of speculative.

This is a case where there had been—a number of officers testified.  There was video, actually you know, the video as I recall it, it was the—I think that's the Maverick system, dash mounted video.  I mean, it clearly showed what was going on.  It recalled, it betrayed the call that Officer Perry was making as he was backing up rapidly.  There was on there the videos [sic].  There was the dialogue of radio traffic between the officers, as well as the sounds of gunshots.

So again, it's not like gee, there's officers here; I wonder why they're here.  No, they're here because somebody—it was a chase, officers were fired upon.  Multiple officers were involved in the chase. And perhaps I weighed that as saying you know, this is not something that's so you know, unusual given the evidence that it requires me to ask them to leave.

Q.  All right.  So I guess what I'm asking, I think you have answered is that it would not have been something that wouldn't have been cross—it wouldn't have crossed your mind because in fact it was brought to your attention by your client.

A.  Yes.

Q.  And the process you just went through of weighing whether or not to object would have been a process you would have went through, at the time?

A.  Again, I'm recounting all this now, not from memory.  But I'm just peacing [sic] together and saying well, if this is what happened—if they were here before the jury got in the box, I probably would have been more likely to raise the issue.  If they came in while the jury was in the box, perhaps I thought that I would only draw more attention to it by objecting.  And particularly, if the Judge would have said they have every right to be here, Mr. Holton—denied.  You know, that would have I think made it certainly not better.

And the other issue about whether I felt that it was perhaps given the circumstances of the trial and the evidence, that it was something that I felt needed not be brought up.  Again, there's all sort of possibilities. I can't tell you this is why I did not object.  I wish I could, but I can't.

Q.  I guess you knew at the time.  Did you realize at the time, or would have known at the time, that you could raise an objection?

A.  I think that, yes.  I think I could object, could object to anything.  You know obviously, people have right [sic].  It's a public courtroom and people have a right to appear.  And I think the rule, which

was probably invoked, was no longer in effect since all the evidence had been presented.  So yes, I knew I could have objected.

> Q.  And the situation was brought to your attention?
>
> A.  Yes.
>
> Q.  And then for whatever reason you elected to not make an objection?
>
> A.  That seems to be what happened, yes.

(Ex. GG at 53–59).

On re-direct examination, Attorney Holton testified that when the jury returned to the courtroom to view the video, the jury again would have had an opportunity to see the audience (Ex. GG at 81).  Holton testified that if he believed that an objection to the officers' presence in the audience was warranted, he could have either objected in the jury's presence or requested a sidebar (*id.* at 81–82).

Throughout Holton's testimony, he refreshed his recollection with the trial transcript.  According to the transcript, the jury began deliberating at 8:10 p.m. on September 29, 2004 (Ex. B at 464–65).  Upon the jury's request, the trial adjourned for the day at 9:50 p.m. (*id.* at 476–77).  The jury returned to the courtroom at 8:55 a.m. the next day, September 30, 2004 (*id.* at 479–80).  The trial court questioned the jury as to whether any of them had been exposed to any outside information regarding the case, to which the jury responded no (*id.* at 480).  At 8:57 a.m., the jury left the courtroom to continue deliberations (*id.* ).  The jury returned to the courtroom at 9:45

a.m. to re-view a videotape that had been admitted into evidence, and left the

courtroom five minutes later (*id.* at 481–83).  The jury then returned to the courtroom

with a verdict at 10:15 a.m. (*id.* at 483–84).

The trial transcript also shows that immediately prior to deliberations, the trial

court instructed the jury as follows:

> Now these are some general rules that apply to your discussion.
> You must follow these rules in order to return a lawful verdict.  You
> must follow the law as it is set out in these instructions.  If you fail to
> follow the law your verdict will be a miscarriage of justice. There is no
> reason for failing to follow the law in this case.  All of us are depending
> upon you to make a wise and legal decision in this matter.
>
> This case must be decided only upon the evidence that you have
> heard from the testimony of the witnesses and have seen or will see in
> the form of the exhibits in evidence and these instructions.
>
> This case must not be decided for or against anyone because you
> feel sorry for anyone or are angry at anybody.
> . . . .
> Your verdict should not be influenced by feelings of prejudice,
> bias, or sympathy.  Your verdict must be based on the evidence and on
> the law contained in these instructions.

(Ex. B at 409–10).  All of the empaneled jurors took an oath to be fair and impartial

(*see id.* at 9).

At the conclusion of the post-conviction evidentiary hearing, the state circuit

court made oral factual findings and conclusions of law, which were adopted and

incorporated into a written order denying the Rule 3.850 motion (*see* Ex. EE at 49, Ex.

GG).  The reasons for the court's denial of Ground Five were the following:

THE COURT:  Now, the final issue is the issue of the officers in the courtroom.  We have testimony that there were a number of officers that were in the courtroom, according to Mr. Shabazz, when the jury came in 8:55 p.m. [sic] in the morning.  We know from Mr. Shabazz's testimony they were there for the verdict.  Obviously, I find their presence at the reading of the verdict is not prejudicial to Mr. Shabazz. The verdict was in; the jury had made its decision.  So there would be no reason for Mr. Holton [Petitioner's trial counsel] to object, at least at that point.

And I don't think the defense is arguing that, because that would be a moot issue at that point, once the verdict is raised.  The question is, should Mr. Holton have raised the issue when Mr. Shabazz called it to his attention that morning?  It certainly isn't clear for purposes of the evidence today as whether or not the officers were sitting in the courtroom when the video was played.  We don't know that, one way or the other.

So the question really comes down to well, I would have to make a—determine whether or not Mr. Holton's failure to object was ineffective assistance of counsel, but I'll get to that in a minute.  Really the crux of this issue is the two minutes the jury is in the courtroom prior to rendering a verdict, assuming at least ten police officers are in here, is that prejudicial to Mr. Shabazz?

MR. STEVENSON [Petitioner's counsel]: I would say also the—if you mean the two minutes between 8:55 and 8:57.  When they came in that morning when they're still deliberating did they see that?

THE COURT:  Yes.

MR. EVANS [for the State]: Yes.

THE COURT:  Yes.  That's the crux of the issue, is whether or not that was so prejudicial it would have the jury could have reached a different outcome on that issue.

MR. STEVENSON:  And I guess while Court is considering I would also throw into that, not only a failure to object, but also if he saw

it was an issue if his client brought it to his attention, he didn't even put it on the record.  So I mean, it clearly occurred to him that it was an issue.  Whether or not it was worth objecting to is one thing, but not even putting it on the record I would say is why we have this condry [sic] now.

THE COURT:  Well, how is that—how does that go to the second prong of your argument though, the fact that he put it on record or didn't put it on the record?

MR. STEVENSON:  How does that go to my second prong of my record [sic] that he didn't put it on the record?

THE COURT:  Uh-huh.

MR. STEVENSON:  Well, first of all, I would say it's deficient for him, A, not to put it on the record, B, not to object.

And then how does this impact Musa right now is that it's not—because he didn't object it's not something that—because he didn't object it's not something which can be brought up on appeal and because it's not even in the record it can't even be brought up as fundamental error—which I think Mr. Evans was bringing out that one of the cases, which I had brought up, did have it as fundamental error. So I would say on both of those grounds it was ineffective and prejudicial.

THE COURT:  Since I've allowed elaboration, Mr. Evans, do you have any elaboration?

MR. EVANS:  I think it's a situation where he looked at it, he recognized it and decided it was not something that he thought was worthy of objection—objecting to, then I don't see why anyone would put it on the record, other than just being way overly cautious.  It's like one of those things where you know, I think that—you know, the person sitting over here may be some concern, but I don't think it worthy of objection.  But I just wanted to put that on the record—is a situation where everybody would be sort of scratching their heads.  Well, if you don't think it's worth an objection, why in the world are you talking about it?

I don't think—I don't see how that failure to put it on the record could be shown as being prejudicial, if that's what you were referring to.

THE COURT:  Okay.  First of all, I wouldn't find it ineffective assistance of counsel for a defense attorney to not put on the record things of that nature.  I mean, and then you would be commenting on everything going on in the courtroom all the time.  If that's the standard for defense attorneys, we'd need to schedule a lot more time for trials because you'd be commenting about well, this juror is rolling their eyes and this—I mean, there are so many things that go on in a courtroom during a trial, people get up and leave, walk in and out.

Obviously, we have a court reporter taking down everything, so you might want to—and there are times where you would want to make a notation of behavior in the courtroom because the court reporter can't be taking down behavior.

Classic example is during jury selection, Juror 7 is completely asleep.  You might want to take a sidebar and make a record that don't know if counsel was paying attention, but Juror 7 has largely been sleeping the entire morning—because if you want to strike a juror, if you haven't put that on the record, you don't have a record basis to strike a juror because it's nonverbal conduct that's going on that the court reporter can't take down unless you verbalize that conduct.

Okay.  That's Number one, so I don't think that the standard is for defense counsel having to make a record for that purpose.  The question is whether or not Mr. Holton should have objected to the officer's [sic] presence in the courtroom.

First of all, I think that's a strategic decision on his part whether or not, if we believe Mr. Shabazz, which let's for the sake of this record say that the jury came in and the officer's [sic] were already in the courtroom.  That's what he said.  Mr. Holton had no independent recollection of when the jurors were in the courtroom.  He said that may have made a difference to him arguably, speculation at this point.  He may have made—I think that is a strategic decision because at that point the jury is coming in, they're being seated, and then now we're going to make an objection.  That would then call that to the attention of the jury.

I suppose he could have taken a sidebar for that proposition, if he felt it appropriate to make an objection.  He didn't.

Secondly, I think it would obviously, the jury is not—the jury's not oblivious to the fact that this was a case where the defendant's [sic] were charged with shooting at cops.  So, you know, they've got a video of it apparently.  I haven't seen the video, but it's on the Maverick system with the dad apparently firing shots at deputies.

It's not surprising that law enforcement would want to come and see what's going to happen with this trial.  I think it's different, though, if—say, it's a sexual battery and the jury comes in and there's 20 police officers sitting on the prosecution side where, you know, while they may have investigated—probably not that many, but especially if it's officers that didn't testify during the trial.  I don't know if I'm making my point.

But if there's a huge show of law enforcement in a trial that's not about a law enforcement officer being shot at, I think that would be more problematic than law enforcement showing up at the end of the trial when the evidence is concluded and they're in front of the jury for two minutes.  I think it would be more problematic if law enforcement was here the entire two days while all the testimony was going on showing, quote, support for Officer Perry [one of the victims].

So I don't—Number one, I don't think it's ineffective assistance of counsel for Mr. Holton not to have objected.  And I don't find that even if it was ineffective assistance of counsel that the jury seeing we don't know the number, but at least ten probably—officers, were present in the courtroom, that that two minutes—especially when they're given all of these instructions about bias and prejudice and sympathy, and all of that, that that prejudiced the outcome of this case in light of the face of the overwhelming evidence.

(Ex. GG at 121–28).

Upon issuance of the circuit court's final order denying the Rule 3.850 motion,

Petitioner appealed the decision.  Petitioner's appellate counsel raised this issue as the

sole issue in his initial brief on appeal (Ex. HH).  The First DCA affirmed the lower

court's decision without written opinion (Ex. JJ).

The state court's rejection of Petitioner's claim of ineffective assistance of trial

counsel ("IATC") was not based upon an unreasonable determination of the facts.

The court found as fact that the uniformed officers were in the courtroom when the

jury entered at 8:55 a.m on the day they continued deliberations and reached a verdict.

Petitioner's testimony supports this finding.  The court further found that the jury was

in the presence of the officers for two minutes, from 8:55–8:57 a.m.  The testimony

of Petitioner and Attorney Holton support this finding, as does the trial transcript.

Finally, the court found that Attorney Holton made a strategic decision not to object

to the presence of the officers in the courtroom.  Petitioner appears to argue that the

fact that Attorney Holton could not recall his reason for not objecting proves that

Holton did not make a strategic decision regarding whether to object (*see* ECF No. 33

at 2–4).  However, this argument speaks not to whether counsel made a strategic

decision, but rather to whether counsel's judgment was reasonable.  *See* <u>Wood v.

Allen</u>, 558 U.S. 290, 302–02, 130 S. Ct. 841, 175 L. Ed. 2d 738 (2010).  Although

Attorney Holton initially testified that his failure to object to the officers' presence

was not strategic, he later explained that he in fact elected not to object.  More

specifically, he testified that even though he could not recall his reason for not

objecting, he stated he was aware of the issue because Petitioner brought it to his

attention, he (Holton) knew that he could have objected, but he (Holton) chose not to make an objection.  He also offered various possible explanations for his decision to refrain from objecting, noting that it could have turned on whether the officers were in the courtroom before or after the jury entered the courtroom, or on the likelihood of the objection being overruled by the trial court, considering generally the officers' right to attend the trial and noting that some of the officers in attendance were apparently witnesses in the case.  This evidence supports the state court's factual finding that Holton made a strategic decision, and Petitioner has not shown by clear and convincing evidence that this finding was unreasonable.

It is also important to note what the state court did <u>not</u> find as fact.  The court did not find that the uniformed officers were in the courtroom when the jury returned to view the videotape, from 9:45–9:50 a.m. on September 30, 2004.  As the state court noted, the evidence was not clear as to whether officers were in the courtroom at that time.  Petitioner testified that the officers were in the audience during that 5-minute period.  Attorney Holton testified that the officers were in the audience prior to the jury's reaching its verdict, and that the jury had an opportunity to see the <u>audience</u> when they returned to the courtroom to view the videotape, but he did not testify that the officers were in the audience at that time.  The trial transcript shows that after the jury left the courtroom at 8:57 a.m., people left the courtroom, and although the trial transcript is clear that the defendants, counsel, and members of the audience returned

to the courtroom when the jury returned to view the videotape at 9:45 a.m., it is not clear whether, or how many, uniformed officers were among those who were in the audience at the time:

> THE COURT: Okay. The Shabazz's are present. The jury wants to see the video again.

> (SHORT PAUSE IN COURTROOM WHILE VIDEO WAS RESET)

> THE COURT: Okay. Everybody is present. Now, let me say to everyone, please, no verbal responses or saying anything while the jury is in the courtroom. There won't be any communication with the jury, other than me just telling them that we'll start and stop it at their request. Okay? Pause it, back it up.

> MR. SHEFFIELD [counsel for Co-Defendant Shabazz]: As well as no nonverbal responses.

> THE COURT: No nonverbal responses either. And if everybody would take a seat. All right. Let's bring them in.

> (THEREUPON, THE JURY WAS RETURNED TO THE COURTROOM AT 9:45 A.M.)

> THE COURT: Please be seated. The record will reflect that the jury is in the jury box. Counsel and the defendants are present. Members of the jury, we've received your note. And I apologize for the delay, but actually the courtroom was full and we had to do some logistics and get the lawyers from other courtrooms to get them here, but we're ready to go now.

> Once again, I'm going to ask—Mr. Balboni is manning the clicker. Mr. Hoeben [the foreperson], if you will tell them when to stop, start, back up, pause whatever. Okay? But there won't be any other communication other than that. All right? Except for Mr. Flury [the prosecutor] is going to tell him when to stop at the end. Okay.

(THEREUPON, THE VIDEO WAS PUBLISHED TO THE JURY)

FOREPERSON:  Back it up.

(THEREUPON, THE VIDEO WAS REWOUND AND PUBLISHED TO THE JURY)

FOREPERSON:  Back it up.

(THEREUPON, THE VIDEO WAS REWOUND AND PUBLISHED TO THE JURY)

FOREPERSON:  Okay.

THE COURT:  All right.  Please resume your deliberations.

(THEREUPON, THE JURY WAS REMOVED FROM THE COURTROOM AT 9: 50 A.M.)

THE COURT:  What we will do then is move to 3-D [another courtroom] to continue with the VOP'S and leave this courtroom open so that we don't have the delay.  So if you will please go to 3-D now, we will continue with the violation of probation matters.  And Robert [the bailiff], I guess the Shabazzes can go wherever you take them.

(THEREUPON, COURT WAS IN RECESS AWAITING THE JURY)

THE COURT:  The Shabazz jury has notified the bailiff that they have reached a verdict.  Mr. Shabazzes are here.  Counsel is here.  And I'm going to ask again from the people in the audience that you not react in any way, verbally or physically to the verdict.
. . . .
(THEREUPON, THE JURY WAS RETURNED TO THE COURTROOM AT 10:15 A.M.)

(Ex. B at 481–84). There is no indication in the record that the attention of any of the jurors was on anything but the videotape during the 5-minute period when the video was replayed.

Given the state court's factual findings, that several uniformed officers were in the courtroom when the jury was in the courtroom from 8:55–8:57 a.m on the day the jury continued deliberations and reached a verdict, and that Attorney Holton made a strategic decision not to object to the officers' presence, the next question is whether the state court reasonably applied <u>Strickland</u> in denying Petitioner's claim.

The undersigned concludes that the state court reasonably concluded that Petitioner failed to demonstrate that Attorney Holton was ineffective for failing to object to the presence of the uniformed officers as inherently prejudicial. The Supreme Court has generally held that central to the right to a fair trial guaranteed by the Sixth and Fourteenth Amendments is the principle that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." <u>Taylor v. Kentucky</u>, 436 U.S. 478, 485, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978); *see also* <u>Irvin v. Dowd</u>, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) (the Sixth and Fourteenth Amendments guarantee the right of state criminal defendants to be tried "by a panel

of impartial, 'indifferent' jurors . . . [whose] verdict must be based upon the evidence developed at trial").

The Supreme Court has generally analyzed outside intrusions upon the jury for prejudicial impact.  *See, e.g.,* Parker v. Gladden, 385 U.S. 363, 87 S. Ct. 468, 17 L. Ed. 2d 420 (1967) (per curiam) (bailiff's comments to jurors, such as "Oh that wicked fellow he is guilty," were prejudicial); Patton v. Yount, 467 U.S. 1025, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984) (pretrial publicity was not prejudicial); Holbrook v. Flynn, 475 U.S. 560, 571, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986) (presence of uniformed state troopers in courtroom was not prejudicial).  The ultimate inquiry is whether the intrusion prejudiced the defendant, "either specifically or presumptively." *See* United States v. Olano, 507 U.S. 725, 739, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993) (holding that the presence in the jury room during deliberations of alternates, who had been instructed that they could sit in on the deliberations but were not to participate, was not plain error as it did not affect substantial rights of defendants).

The Supreme Court summarized "intrusion" jurisprudence in Smith v. Phillips, 455 U.S. 209, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) as follows:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation.  Were that the rule, few trials would be constitutionally acceptable.  The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.  Due process means a jury capable and willing to decide the case solely on the

evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

455 U.S. at 217.

The Eleventh Circuit examines the "totality of circumstances" in determining whether an outside intrusion prejudiced a defendant. Woods v. Dugger, 923 F.2d 1454, 1457 (11th Cir. 1991). The Eleventh Circuit has held that to prevail on a defendant's claim that he did not receive a fair trial, a defendant must establish that the events surrounding his trial resulted in either actual or presumed prejudice. *See* Mills v. Singletary, 63 F.3d 999, 1009 (11th Cir. 1995) (citing Coleman v. Kemp, 778 F.2d 1487, 1489 (11th Cir. 1985); Coleman v. Zant, 708 F.2d 541, 544 (11th Cir. 1983)); Woods, 923 F.2d at 1457.

"Actual prejudice means more than just the possibility of prejudice; it requires that the error 'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" Ward v. Hall, 592 F.3d 1144, 1178 (11th Cir. 2010) (quoting United States v. Frady, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982)). To demonstrate actual prejudice, the defendant must prove that "one or more jurors entertained an opinion before the trial" that the defendant was guilty and "that these jurors could not put this prejudice aside and render a verdict based solely on the evidence presented." Mills, 63 F.3d at 1009 (citing United States

v. De La Vega, 913 F.2d 861, 864–65 (11th Cir. 1990); United States v. Lehder–Rivas, 955 F.2d 1510, 1525 (11th Cir. 1992)).

To determine whether the defendant has established presumed prejudice, which is what Petitioner argues here, the court must examine whether:  (1) the event at issue was sufficiently prejudicial and inflammatory, and (2) the event saturated the pool of potential jurors. See Mills, 63 F.3d at 1010; Coleman, 708 F.2d at 544 (holding that this standard applies to a defendant's claim that the trial court deprived him of a fair trial by an impartial jury by denying a change of venue based upon pretrial publicity). The Eleventh Circuit has repeatedly noted that the principle of presumed prejudice "is rarely applicable and reserved for extreme situations."  See Mills, 63 F.3d at 1010; Bundy v. Dugger, 850 F.2d 1402, 1424 (11th Cir. 1988); Woods, 923 F.2d at 1459.

Both federal courts and Florida state courts have found inherent prejudice in cases involving an atypical courtroom presence—whether law enforcement or otherwise.  See, e.g., Woods, 923 F.2d at 1459–60 (hostile atmosphere created by pretrial publicity in small rural community in which defendant's capital murder trial took place for killing of prison guard, in combination with number of prison guards who attended trial in full uniform, rose to level of "inherent prejudice," thereby depriving defendant of fair trial; one third of county population of 10,000 were prisoners, 23% of county residents employed outside home worked within prison system, about half of the more than 40 spectators visible in photographs taken during

trial appeared to be wearing prison guard uniforms, officers were not present to escort prisoners, as part of courtroom security, or as witnesses, and it appeared the officers wanted to communicate the message to the jury that they "wanted a conviction followed by the imposition of the death penalty"); Norris v. Risley, 918 F.2d 828, 830 (9th Cir. 1990) (finding spectators at a kidnapping and rape trial who were wearing buttons inscribed with the words "women against rape" posed an impermissible factor, "[b]ecause the buttons . . . conveyed an implied message encouraging the jury to find Norris guilty, and because the buttons were not subject to the constitutional safeguards of confrontation and cross-examination"); Long v. State, 151 So. 3d 498, 501–02 (Fla. 1st DCA 2014) (presence of a group of men wearing leather jackets bearing the insignia, "Bikers Against Child Abuse," at defendant's trial on charge of lewd and lascivious molestation and sexual battery, created an inherently prejudicial atmosphere and deprived defendant of due process, because clothing was intended to communicate to the jury that defendant was a sexual abuser and that sexual abuse was to be condemned by a guilty verdict); Shootes v. State, 20 So. 3d 434, 438, 439–40 (Fla. 1st DCA 2009) (noting that "[t]he presence of courtroom observers wearing uniforms, insignia, buttons, or other indicia of support for the accused, the prosecution, or the victim of the crime does not automatically constitute denial of the accused's right to a fair trial"; but holding that defendant showed inherent prejudice where a large number of law enforcement personnel were present in courtroom on last

day of trial for aggravated assault, stemming from incident in which defendant fired

gun at officers attempting to detain him; approximately half or more of the spectators

were officers, officers sat together as a group in seats closest to jury, some officers

wore formal and informal uniforms, and officers' apparel was feature of trial, directly

related to defendant's theory of self-defense, since defendant testified that at time he

fired on officers, he did not recognize them as such).

The common denominator in these cases is that the "impermissible factor" tends

to suggest that the particular defendant is guilty and undermine the presumption of

innocence. *See, e.g.*, Holbrook, 475 U.S. at 571 (finding presence of four armed

uniformed state troopers not inherently prejudicial and noting "we cannot believe that

the use of the four troopers tended to brand [the defendant] in [the jurors'] eyes with

an unmistakable mark of guilt.") (citation and quotation omitted). *Cf.* Parker v.

Gladden, 385 U.S. at 363 (recognizing the "extreme prejudice inherent" in bailiff's

comments to jurors, such as "Oh that wicked fellow he is guilty").

Here, the trial transcript demonstrates that several officers and investigators

testified at trial, including Chuck Perry and Michael Goldwich (the victims of the

shootings), James Fairfield, Todd Lombardo, W.V. McConnell, Ron McNeal, and Jeff

Fennell (Ex. B at 53–187, 210–47).  Additionally, the jury saw a video from the

camera mounted to Officer Perry's dashboard (which included audio), which Attorney

Holton described as including Officer Perry's call to dispatch as he was backing up

rapidly to avoid gunfire from Abdul Shabazz, and the dialogue of radio traffic between the officers involved, as well as the sounds of gunshots.  It would not be uncommon for persons who testified at trial and were involved in the events to be curious about the outcome of the trial.

Additionally, unlike in <u>Shootes</u>, the officers' apparel was not a feature of trial or directly related to Petitioner's theory of defense.[8]  Petitioner's defense was that even though he drove the car in which his father was a passenger at the time his father shot at the officers, Petitioner never intended to effect the death of Officer Perry.[9]

Moreover, even if the officers' attendance in uniform was intended to communicate to the jury that the police department was unified in its support for Officers Perry and Goldwich, and that shooting at a police officer should be condemned by a guilty verdict, the officers' presence did not tend to suggest that <u>Petitioner</u> was guilty of attempted murder and undermine the presumption of innocence as to Petitioner.  As previously noted, Petitioner was not the only defendant in this trial—Petitioner's father, Abdul Shabazz, was also on trial.  There was no dispute that Abdul Shabazz was the person who shot at Officer Perry's patrol car.

---

[8] In <u>Shootes</u>, the defendant's theory of defense was self-defense.  20 So. 3d at 439–40. Shootes testified that at the time he fired upon officers, he did not recognize them as such, that he believed he was acting in self-defense, and that only after the confrontation was over did he realize that the officers were not robbers.  *Id.*

[9] Petitioner was not charged with attempted murder as to Officer Goldwich; only Abdul Shabazz was charged with that offense (Count III) (*see* Ex. A at 1–2).

Counsel for Abdul Shabazz conceded to the jury in closing arguments that the evidence supported a guilty verdict for his client on the charge of shooting into Officer Perry's patrol car while Perry was driving it, as well as a guilty verdict for his client on the offense of attempted voluntary manslaughter of Officer Perry (a lesser included offense of the attempted murder charge as to Officer Perry) (*see* Ex. B at 462). Counsel's concession as to Abdul Shabazz's guilt occurred prior to the jury's exposure to the uniformed officers. Further, the jury viewed (at least once during trial and twice during deliberations) a videotape showing that Abdul Shabazz twice exited the vehicle driven by Petitioner and fired guns, including an assault rifle, at Officer Perry's patrol car (*id.* at 61–65, 67, 73, 75). Even if the uniformed officers were sending a message that someone who shoots at a police officer should be punished with a guilty verdict, that message would have been inherently prejudicial primarily, if not exclusively, to Abdul Shabazz, who was the admitted, single shooter.

To the extent Petitioner contends Attorney Holton should have relied upon actual prejudice in support of an objection to the officers' presence, his argument is even less convincing. As previously discussed, to demonstrate actual prejudice, the defendant must prove that "one or more jurors entertained an opinion before the trial" that the defendant was guilty and "that these jurors could not put this prejudice aside and render a verdict based solely on the evidence presented." Mills, 63 F.3d at 1009. Here, Petitioner has made no showing that one or more jurors entertained the opinion

that he was guilty prior to trial.  Furthermore, as noted *supra*, prior to deliberations the trial court instructed the jury that its verdict should be based on the evidence and not on feelings of sympathy, anger, prejudice, or bias.  In addition, all of the empaneled jurors took an oath to be fair and impartial.  Jurors are presumed to follow the law as instructed by the trial court and to comply with their oaths.  Hallford v. Culliver, 459 F.3d 1193, 1204 (11th Cir. 2006) (citing Raulerson v. Wainwright, 753 F.2d 869, 876 (11th Cir. 1985)); United States v. Ramirez, 426 F.3d 1344, 1352 (11th Cir. 2005). Petitioner failed to show that Attorney Holton had a meritorious basis to object to the officers' presence on the ground that it actually prejudiced Petitioner.  Therefore, Holton was not ineffective in that regard.

Fairminded jurists could disagree that Attorney Holton was ineffective for failing to object to the uniformed officers' presence in the courtroom on the last day of deliberations, under the circumstances previously described.  However, it is this potential for disagreement which precludes federal habeas relief.  *See* Richter, 562 U.S. at 101 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.") (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Petitioner failed to satisfy § 2254(d) with respect to the state court's denial of his IATC claim regarding Attorney Holton's failure to object to the presence of

uniformed officers in the courtroom under the circumstances previously described.

Therefore, Petitioner is not entitled to federal habeas relief on Ground One.

B.    Ground Two:  "Counsel failed to object to the use of 'and/or' between both co-defendants' names when instructing the jury as to Counts I and II."

Ground Three:   "Trial counsel was ineffective for failing to properly research and argue the motion for acquittal as to Counts I and II, principal in the 1st degree to attempted murder."

In Ground Two, Petitioner claims that Attorney Holton was ineffective for failing to object to the use of "and/or" in the jury instructions as to Counts I and II (ECF No. 1 at 7).[10]  Petitioner argues that he was prejudiced by counsel's failure to

---

[10] Petitioner is referring to the following instructions:

In counts 1 and 2, to prove the crimes of attempted first-degree murder in counts 1 and 2, the State must prove the following elements beyond a reasonable doubt:

1.  Musa Shabazz and/or Abdul Shabazz did some act intended to cause the death of Charles Perry, that went beyond just thinking or talking about it.

2.  Musa Shabazz and/or Abdul Shabazz acted with a premeditated design to kill Charles Perry; and

3.  The act would have resulted in the death of Charles Perry except that someone prevented Musa Shabazz and/or Abdul Shabazz from killing Charles Perry, or they failed to do so.
. . . .
If you find that the crime of attempted first-degree murder was committed, an issue in this case is whether the crime of attempted first-degree murder was an independent act of a person other than the defendant Musa Shabazz.

An independent act occurs when a person, other than the defendant, commits or attempts to commit a crime which the defendant did not intend to occur, and in which the defendant did not participate, and which was outside of and not a reasonably foreseeable consequence of the common design or unlawful act contemplated by the defendant.

object, because the jury could have convicted him based solely upon the conclusion that Abdul Shabazz's conduct satisfied the elements of the offenses, and the jury instruction issue was not preserved for appellate review (*id.*).

In Ground Three, Petitioner claims that Attorney Holton was ineffective for failing to adequately research the law governing Florida Statutes § 777.011 (the statute governing principal liability), and failing to challenge the sufficiency of the evidence as to Counts I and II (ECF No. 1 at 8).  Petitioner contends the prosecution never proved Petitioner's intent with regard to the attempted murder counts, and Attorney Holton failed to adequately argue this point during his motion for judgment of acquittal (*id.*).

Respondent contends Petitioner failed to exhaust both of these claims (ECF No. 30 at 49–59).  Respondent contends that although Petitioner presented these claims in his Rule 3.850 motion, he failed to present them to the First DCA on appeal of the circuit court's decision denying the Rule 3.850 motion (*id.*).  Therefore, the claims are procedurally defaulted and barred from federal habeas review (*id.*).

In Petitioner's reply, he argues that the procedural default was caused by ineffective assistance of his collateral appellate counsel (ECF No. 33 at 4–7).

---

If you find that the attempted first-degree murder was an independent act of Abdul Shabazz, then you should find Musa Shabazz not guilty of the crime of attempted first-degree murder.

(Ex. B at 389–91).

Petitioner contends he is entitled to federal review of Grounds Two and Three pursuant to <u>Martinez v. Ryan</u>, 132 S.Ct. 1309 (2012) (*id.*).

The state court record demonstrates that Petitioner raised eight claims in his Rule 3.850 motion and amendments thereto (Ex. GG at 1–33).  The state circuit court summarily denied five claims and set an evidentiary hearing on the remaining three claims (*id.* at 41–45).  The court appointed counsel to represent Petitioner at the hearing (*id.* at 46).  Following the evidentiary hearing, the court denied Petitioner's remaining claims (Ex. EE at 49, Ex. GG).  Petitioner, through counsel (Attorney Baya Harrison, III), appealed the decision to the First DCA, Case No. 1D13-2046 (Ex. HH).  Counsel's initial brief, filed on April 1, 2014, raised only one claim, that the lower court erred by denying Petitioner's claim of ineffective assistance of counsel based upon counsel's failure to object to the presence of uniformed officers in the courtroom (Ex. HH).

At the time of the post-conviction appeal, the Florida Rules of Appellate Procedure provided, in relevant part:

> **(b) Appeals from Post-Conviction Proceedings Under Florida Rule of Criminal Procedure 3.800(a), 3.850, or 3.853.**
> . . . .
> (2) *Summary Grant or Denial of Motion Without Evidentiary Hearing.*
>
> > (A) When a motion for post-conviction relief under rule 3.800(a), 3.850, or 3.853 is granted or denied without an evidentiary hearing, the clerk of the lower tribunal shall electronically transmit to the court, as the record, the motion, response, reply,

order on the motion, motion for rehearing, response, reply, order on the motion for rehearing, and attachments to any of the foregoing, together with the certified copy of the notice of appeal.

. . . .

(C) No briefs or oral argument shall be required, but any appellant's brief shall be filed within 15 days of the filing of the notice of appeal. The court may request a response from the appellee before ruling.

(D) On appeal from the denial of relief, unless the record shows conclusively that the appellant is entitled to no relief, the order shall be reversed and the cause remanded for an evidentiary hearing or other appropriate relief.

(3) *Grant or Denial of Motion after Evidentiary Hearing.*

. . . .

(C) **Briefs.** Initial briefs shall be served within 30 days of service of the record or its index.  Additional briefs shall be served as prescribed by rule 9.210.

Fla. R. App. P. 9.141.

Thus, under Florida law when all claims in a post-conviction motion are denied summarily without evidentiary hearing, a defendant need not file a brief addressing any issue in order to obtain full appellate review.  *See* <u>Gillis v. State</u>, 807 So. 2d 204, 206 n.1 (Fla. 5th DCA 2002); <u>Boston v. State</u>, 722 So. 2d 750 (Fla. 1st DCA 1998); Fla. R. App. P. 9.141(b)(2)(C).  On the other hand, when some or all claims in a post-conviction motion are denied after evidentiary hearing, briefing is required, and failure to include and sufficiently argue any and all claims on which appellate review is sought, including those denied summarily, operates as a waiver of that claim under established and regularly enforced Florida procedural law.  *See* <u>Pennington v. State</u>,

34 So. 3d 151, 153 n.1 (Fla. 1st DCA 2010).  It is well established in Florida courts

that claims for which an appellant has not presented any argument are insufficiently

presented for review and are waived.  *See* Gamble v. State, 877 So. 2d 706 (Fla.

2004); Reed v. State, 875 So. 2d 415 (Fla. 2004); Cooper v. State, 856 So. 2d 969, 977

n.7 (Fla. 2003); Marshall v. State, 854 So. 2d 1235, 1252 (Fla. 2003); Sweet v. State,

810 So. 2d 854, 870 (Fla. 2002); Johnson v. State, 769 So. 2d 990, 1005–06 (Fla.

2000); Shere v. State, 742 So. 2d 215, 217 n.6 (Fla. 1999); Duest v. Dugger, 555 So.

2d 849, 852 (Fla. 1990).  Florida courts consistently apply this rule, even in cases

where a post-conviction evidentiary hearing is limited in scope to some but not all

post-conviction claims; thus a movant wishing to preserve any claims for appellate

review, whether summarily denied or not, must present argument on those issues in

his initial brief.  *See* Prince v. State, 40 So. 3d 11 (Fla. 4th DCA 2010); Hammond v.

State, 34 So. 3d 58 (Fla. 4th DCA 2010) (claim for which appellant did not present

argument, or for which he provided only conclusory argument, was insufficiently

presented for appellate review, regardless of whether claim was among those claims

litigated at evidentiary hearing or among those claims summarily denied by trial

court); Williams v. State, 24 So. 3d 1252 (Fla. 1st DCA 2009) (where appellant

received evidentiary hearing on some of his post-conviction claims and others were

summarily denied, appellate court would review only those summarily denied claims

which movant argued in appellate brief); *see also* Ward v. State, 19 So. 3d 1060, 1061

(Fla. 5th DCA 2009) (en banc) (where all of appellant's post-conviction claims were summarily denied, but appellant chose to file initial brief on appeal (even though not required to do so under Fla R. App. P. 9.141(b)(2)), appellant abandoned any issues not addressed in initial brief); <u>Watson v. State</u>, 975 So. 2d 572 (Fla. 1st DCA 2008) (same); <u>Austin v. State</u>, 968 So. 2d 1049 (Fla. 5th DCA 2007) (same).[11]

This federal district court has concluded that the Florida procedural rule deeming as waived or abandoned those claims for which an appellant has not presented any argument in his appellate brief, even when the insufficiently presented claims were summarily denied by the trial court, is a firmly established and regularly followed procedural rule for purposes of federal habeas. *See, e.g.*, <u>Rasley v. Buss</u>, No. 5:08cv368/RH/EMT, 2011 WL 2358650, at *20 (N.D. Fla. Apr. 11, 2011) (citing <u>Corn v. McNeil</u>, No. 3:08cv199/MCR/EMT, 2010 WL 5811343 (N.D. Fla. Nov. 24, 2010) (unpublished), *Report and Recommendation Adopted by*, 2011 WL 88713 (N.D. Fla. Feb. 10, 2011)); <u>Ross v. McNeil</u>, No. 5:07cv219/RS/EMT, 2010 WL 2179039 (N.D. Fla. Apr. 14, 2010) (unpublished), *Report and Recommendation Adopted by*, 2010 WL 2179037 (N.D. Fla. May 28, 2010) (unpublished), *cert. of appealability denied*, No. 10-13013-A (11th Cir. Oct. 4, 2010) (certificate of appealability sought

---

[11] Even if the Florida appellate courts were not absolutely consistent in applying this rule, such is not required to permit a federal court to conclude that a state procedural rule is adequate for federal habeas purposes. *See* <u>Maples v. Allen</u>, 586 F.3d 879, 888 (11th Cir. 2009) (while "regularly followed" means "closely hewn to," it does not mean complete unanimity or absolute consistency of state decisions applying the rule) (citations omitted).

on issue of whether Florida's procedural rule, that defendant waived or abandoned appellate review of post-conviction claims that were summarily denied and not addressed in defendant's appellate brief, where trial court held evidentiary hearing on other claims, was firmly established and regularly followed); Williams v. Sec's, Dep't of Corr., No. 1:11cv22/MMP/GRJ, 2015 WL 3891540 (N.D. Fla. Jan. 21, 2015) (unpublished); Sharp v. McNeil, No. 4:07cv17/MMP/MD, 2009 WL 981594, at **13–14 (N.D. Fla. Apr. 10, 2009) (unpublished).

In the instant case, the state circuit court held an evidentiary hearing on three of Petitioner's post-conviction claims (Grounds Five, Six and Eight) and summarily denied the remaining claims (Grounds One through Four and Seven) (Ex. EE at 41–45, Ex. GG).  Thus, on appeal from the denial of post-conviction relief, Petitioner was required, under Florida law, to file a brief in the appellate court raising any and all claims on which he sought appellate review.  Of all of the claims Petitioner presented to the state circuit court and on which that court ruled, Petitioner presented only one in his initial brief on appeal to the First DCA, namely, the denial of Ground Five, as noted *supra*.  Under established and regularly followed Florida procedural law, all other post-conviction claims not included in the initial brief on appeal, including the claims which Petitioner presents here as Grounds Two and Three, were abandoned, and are thus procedurally defaulted.

Petitioner argues that the procedural default was caused by ineffective assistance of his post-conviction appellate counsel, and relies upon Martinez as authority for his position that he is entitled to review of Grounds Two and Three of his federal petition.

In Martinez, the Supreme Court announced a narrow, equitable, and non-constitutional exception to the holding of Coleman v. Thompson, 501 U.S. 722, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991) (that ineffective assistance of collateral counsel cannot serve as cause to excuse a procedural default) in the limited circumstances where:  (1) a state requires a prisoner to raise ineffective-trial-counsel claims at an initial-review collateral proceeding; (2) the prisoner failed to properly to raise ineffective-trial-counsel claims in his state initial-review collateral proceeding; (3) the prisoner did not have collateral counsel or his counsel was ineffective; and (4) failing to excuse the prisoner's procedural default would cause the prisoner to lose a "substantial" ineffective-trial-counsel claim.  *See* Lambrix v. Sec'y, Fla. Dep't of Corr., 756 F.3d 1246, 1260 (11th Cir. 2014) (citations omitted).  In such a case, the Supreme Court explained that there may be "cause" to excuse the procedural default of the ineffective-trial-counsel claim.  Martinez, 132 S. Ct. at 1319.  However, the Martinez rule is expressly limited to attorney errors in initial-review collateral proceedings:  "[T]he holding in [Martinez] does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings,

second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts."  Martinez, 132 S. Ct. at 1320 (emphasis added).

Here, the procedural default occurred in the appeal from the initial-review collateral proceeding.  Therefore, Petitioner cannot benefit from the equitable rule announced in Martinez.

Petitioner has failed to demonstrate cause for his procedural default of Grounds Two and Three, or that he is otherwise entitled to federal review of those claims. Therefore, federal habeas relief is unavailable as to these claims.

## V.    CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 29th day of September 2016.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**